**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

**SHENEKA SMITH**, individually and on behalf of all others similarly situated,

240 Laramie Circle,
Madison, Alabama, 35757

Plaintiff,

v.

**NFM LENDING, LLC**,

1190 Winterson Road, Suite 300
Linthicum, Maryland, 21090

Defendant.

Case No.

**DEMAND FOR JURY TRIAL**

## CLASS ACTION COMPLAINT

Plaintiff, Sheneka Smith ("Plaintiff"), through her counsel, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant NFM Lending, LLC ("Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to her own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Defendant's failure to protect highly sensitive data.

2. Defendant is a residential mortgage lending company that provides home loans and refinancing services.

3. As such, Defendant stores a litany of highly sensitive personal identifiable

information ("PII" or "Private Information")—about its current and former clients. But Defendant lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4. Upon information and belief, on or around September 7, 2026, Defendant experienced a Data Breach.[1] Since the Data Breach occurred, the notorious cybercriminal group "Interlock" has claimed responsibility for the Data Breach.[2]

5. Upon information and belief, Interlock gained access to Defendant's IT Network and extracted over 2.5 terabytes of data containing Plaintiff's and Class Members' Private Information—including names, Social Security numbers, and financial information.[3]

6. On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's Private Information. In short, Defendant's failures placed the Class's Private Information in a vulnerable position—rendering them easy targets for cybercriminals.

7. Plaintiff is a Data Breach victim, and she brings this class action on behalf of herself, and all others harmed by Defendant's misconduct.

8. The exposure of one's Private Information to cybercriminals is a bell that cannot be unrung. Before this Data Breach, Defendant's clients' Private Information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

---

[1] *NFM Lending*, Ransomware.live, ransomware.live/id/TkZNIExlbmRpbmdAaW50ZXJsb2Nr (last visited Sep. 16, 2026).

[2] *Id.*

[3] *Id.*

## PARTIES

9. Plaintiff is a natural person and a citizen of Madison, Alabama where she intends to remain.

10. Defendant is a limited liability company formed under the laws of Delaware that maintains its principal place of business at 1190 Winterson Road, Suite 300, Linthicum, Maryland, 21090.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are over 100 putative Class Members, including numerous members maintaining citizenship of States different from Defendant.

12. This Court has personal jurisdiction over Defendant because it is headquartered in Maryland, regularly conducts business and has sufficient minimum contacts in Maryland.

13. Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

***Defendant Collected and Stored the Private Information of Plaintiff and the Class***

14. Defendant is a residential mortgage lending company that provides home loans and refinancing services.

15. As part of its business, Defendant receives and maintains the Private Information of thousands of clients.

16. In collecting and maintaining the Private Information, Defendant agreed it would

safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their Private Information.

17. Under state and federal law, businesses like Defendant have duties to protect its clients' Private Information and to notify them about breaches.

***Defendant's Data Breach***

18. Upon information and belief, on or around September 7, 2026, Defendant experienced a Data Breach.[4] Since the Data Breach occurred, the notorious cybercriminal group "Interlock" has claimed responsibility for the Data Breach.[5]

19. Upon information and belief, Interlock gained access to Defendant's IT Network and extracted over 2.5 terabytes of data containing Plaintiff's and Class Members' Private Information—including names, Social Security numbers, and financial information.[6]

20. Currently, the precise number of persons injured is unclear. But upon information and belief, the size of the putative class can be ascertained from information in Defendant's custody and control.

21. Defendant has not yet begun notifying its clients about the Data Breach.

22. Thus, Defendant continues to keep the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

23. Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the Private Information. And thus, Defendant caused widespread injury and monetary damages.

---

[4] *NFM Lending*, ransomware.live/id/TkZNIExlbmRpbmdAaW50ZXJsb2Nr, *supra* note 1.

[5] *Id.*

[6] *Id.*

24. Simple declarations are insufficient to ensure that Plaintiff and Class Members' Private Information will be protected from additional exposure in a subsequent data breach.

25. Upon information and belief, Defendant has done little to remedy its Data Breach. Such inaction is wholly insufficient to compensate Plaintiff and Class Members for the injuries that Defendant inflicted upon them.

26. Because of Defendant's Data Breach, the sensitive Private Information of Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

***Plaintiff's Experiences and Injuries***

27. Plaintiff is a former client of Defendant, and provided Defendant with her Private Information as a condition of obtaining a mortgage.

28. As a result, Plaintiff was injured by Defendant's Data Breach.

29. Plaintiff is very careful about the privacy and security of her Private Information. She does not knowingly transmit her Private Information over the internet in an unsafe manner. She is careful to store any documents containing her Private Information in a secure location.

30. As a condition of receiving services from Defendant, Plaintiff provided Defendant with her Private Information, which Defendant used to facilitate its services to Plaintiff.

31. Plaintiff provided her Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

32. And, on information and belief, Plaintiff's Private Information has already been

published—or will be published imminently—by cybercriminals on the Dark Web.

33. Through its Data Breach, Defendant compromised Plaintiff's Private Information.

34. Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft.

35. Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

36. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

37. Plaintiff suffered actual injury from the exposure and theft of her Private Information—which violates her rights to privacy.

38. Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

39. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's Private Information right in the hands of criminals.

40. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

41. Today, Plaintiff has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

42. In 2024, the technology and communications conglomerate Cisco published its annual *Consumer Privacy Survey*[7] and *Data Privacy Benchmark Study*.[8] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[9]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[10]

c. 89% of consumers stated that "I care about data privacy."[11]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[12]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[13]

---

[7] *Privacy Awareness: Consumers Taking Charge to Protect Personal Information: Cisco 2024 Consumer Privacy Survey*, Cisco (2024), https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited Sep. 16, 2026).

[8] *Privacy as an Enabler of Customer Trust: Cisco 2024 Data Privacy Benchmark Study*, Cisco (2024), https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-privacy-benchmark-study-2024.pdf (last visited Sep. 16, 2026).

[9] *Cisco 2024 Consumer Privacy Survey*, at 3, *supra* note 7.

[10] *Cisco 2024 Data Privacy Benchmark Study*, at 3, *supra* note 8.

[11] *Cisco 2024 Consumer Privacy Survey*, at 9, *supra* note 7.

[12] *Id.*

[13] *Id.*

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[14]

***Plaintiff and the Proposed Class Suffered Common Injuries and Damages***

43. Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their Private Information is used;

b. diminution in value of their Private Information;

c. compromise and continuing publication of their Private Information;

d. expenses from trying to prevent, detect, and recover from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen Private Information; and

h. continued risk to their Private Information—which remains in Defendant's possession—and is thus at risk for future breaches so long as Defendant fails to take appropriate measures to protect the Private Information.

***Substantially Increased Risk of Identity Theft and Fraud***

44. Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

---

[14] *Id*. at 3, 11.

45. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

46. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

47. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the Dark Web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

48. The dark net is an unindexed layer of the internet that requires special software or authentication to access.[15] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. This prevents dark web marketplaces from being easily identifiable to authorities or those not in the know.

49. A sophisticated black market exists on the dark web where criminals can buy or sell drugs, counterfeit documents, malware, exploitation material, illegal services and sensitive information from data breaches, like the Private Information at issue here.[16] The digital character

---

[15] Louis DeNicola, ed. Michelle Tipsword, *What Is the Dark Web?*, Experian (May 18, 2026), https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (accessed Aug. 28, 2026).

[16] *Id.*

of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. As Experian warns, the anonymity of the dark web lends itself to criminal activity.[17]

50. The unencrypted Private Information of Plaintiff and Class Members has or will end up for sale on the Dark Web because that is the modus operandi of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Plaintiff's and Class Members' Private Information.

51. Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

52. In particular, the theft of Social Security numbers—in combination with other Private Information (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

53. For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that person."[18] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to

[17] *Id.*

[18] Patrick Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, Time (Aug. 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/ (last visited Sep. 16, 2026).

infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[19]

54. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

55. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[20]

56. It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their Private Information is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

57. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

58. For example, armed with just a name and date of birth, a data thief can utilize a

---

[19] *Id.*

[20] John W. Coffey, *Difficulties in Determining Data Breach Impacts* 12, 17 J. Systemics, Cybernetics & Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf (last visited Sep. 16, 2026).

hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

59. Identity thieves can also use an individual's personal data and Private Information to obtain government benefits, get a job, or file a fraudulent tax return using the victim's information.[21] In addition, identity thieves may receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[22]

60. One example of criminals piecing together bits and pieces of compromised Private Information to create comprehensive dossiers on individuals is called "Fullz" packages.[23] These

[21] *What to Know About Government ID Theft*, ITRC (Apr. 9, 2020), https://www.idtheftcenter.org/post/what-to-know-about-government-identity-theft/ (last visited Sep. 16, 2026); *Identity Theft and Your Social Security Number* 4, Soc. Sec. Admin. (Mar. 2026), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Sep. 16, 2026).

[22] *What is Identity Theft?*, Tex. Atty. Gen., https://www.texasattorneygeneral.gov/consumer-protection/identity-theft/what-identity-theft (last visited Sep. 16, 2026).

[23] "Fullz" is fraudster speak for data that includes the information of the victim, such as the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information one has on a victim, the more money can be made off it. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* Krebs

dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen Private Information, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

61. The development of "Fullz" packages means that the Private Information exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

62. According to the FBI's Internet Crime Complaint Center (IC3) *2019 Internet Crime Report*, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[24]

63. Further, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet, Defendant failed to rapidly report to Plaintiff and

---

on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ (last visited Sep. 16, 2026).

[24] *2019 Internet Crime Report Released* (Feb. 11, 2020) FBI, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited Sep. 16, 2026).

the Class that their Private Information was stolen. Defendant's failure to promptly and properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

64. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

65. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

66. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

67. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

68. In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[25]

---

[25] *2024 Data Breach Report* 2, Identity Theft Resource Center (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf (last visited Sep. 16, 2026).

69. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[26]

70. In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations have experienced cyberattacks.[27]

71. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Defendant Could Have Prevented the Data Breach***

72. Data breaches are preventable.[28] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[29]

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[30]

---

[26] Ben Kochman, *FBI*, *Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited Sep. 16, 2026).

[27] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last visited Sep. 16, 2026).

[28] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, in *Data Breach and Encryption Handbook* (2012).

[29] *Id.* at 17.

[30] *Id.* at 28.

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . .. Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [31]

***Defendant Failed to Follow FTC Guidelines***

73. According to the FTC, the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

74. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[32] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

75. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

76. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

---

[31] *Id.*

[32] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Sep. 16, 2026).

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

77. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

78. In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its clients data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

79. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

80. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers;

monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

81. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

82. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

83. Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> **All individuals residing in the United States whose Private Information was compromised in the Data Breach (the "Nationwide Class").**

84. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

85. Plaintiff reserves the right to amend the class definition.

86. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on class-wide bases using the same evidence as

would be used to prove those elements in individual actions asserting the same claims.

87. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control.

88. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 1,000 members.

89. Typicality. Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

90. Adequacy. Plaintiff will fairly and adequately protect the proposed Class's common interests. Her interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

91. Commonality and Predominance. Plaintiff and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendant had a duty to use reasonable care in safeguarding Plaintiff and the Class's Private Information;

b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendant were negligent in maintaining, protecting, and securing Private Information;

d. if Defendant breached contract promises to safeguard Plaintiff and the Class's Private Information;

e. if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendant's notice was reasonable;

g. if the Data Breach caused Plaintiff and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

92. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## FIRST CAUSE OF ACTION
**Negligence**
**(On Behalf of Plaintiff and the Nationwide Class)**

93. Plaintiff incorporates by reference herein paragraphs 1 through 92 above.

94. Plaintiff and the Class entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their Private Information, use their Private Information for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

95. Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their Private Information in a data breach. And here, that foreseeable danger came to pass.

96. Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if their Private Information was wrongfully disclosed.

97. Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined and foreseeable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff's and Class Members' Private Information.

98. Defendant owed—to Plaintiff and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the Private Information in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized access;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their Private Information.

99. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their Private Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

100. Defendant also had a duty to exercise appropriate clearinghouse practices to remove Private Information it was no longer required to retain under applicable regulations.

101. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

102. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential Private Information, a necessary part of obtaining services from Defendant.

103. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class Members' Private Information.

104. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the Private Information entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class Members' sensitive Private Information.

105. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

106. The risk that unauthorized persons would attempt to gain access to the Private Information and misuse it was foreseeable. Given that Defendant holds vast amounts of Private Information, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the Private Information —whether by malware or otherwise.

107. Private Information is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Private Information of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

108. Defendant improperly and inadequately safeguarded the Private Information of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

109. Defendant breached these duties as evidenced by the Data Breach.

110. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff and Class Members' Private Information by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the Private Information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

111. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Private Information of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

112. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

113. The Private Information of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

114. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

115. And, on information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

116. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Private Information by criminals, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**<u>SECOND CAUSE OF ACTION</u>**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

117. Plaintiff incorporates by reference herein paragraphs 1 through 92 above.

118. Defendant provided financial services to Plaintiff and Class Members. Plaintiff and Class Members formed an implied contract with Defendant regarding the provision of those services through their collective conduct, including by Plaintiff and Class Members paying for goods and services from Defendant.

119. Through Defendant's sale of services, it knew or should have known that it must protect Plaintiff's and Class Members' confidential Private Information in accordance with Defendant's policies, practices, and applicable law.

120. As consideration, Plaintiff and Class Members paid money to Defendant and turned over valuable Private Information to Defendant. Accordingly, Plaintiff and Class Members bargained with Defendant to securely maintain and store their Private Information.

121. Defendant accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing goods and services to Plaintiff and Class Members.

122. In delivering their Private Information to Defendant and paying for services, Plaintiff and Class Members intended and understood that Defendant would adequately safeguard the Private Information as part of that service.

123. Defendant's implied promises to Plaintiff and Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of its employees is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees and/or agents; (4) designing and

implementing appropriate retention policies to protect the Private Information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; and (7) taking other steps to protect against foreseeable data breaches.

124. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of such an implied contract.

125. Had Defendant disclosed to Plaintiff and the Class that they did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and Class Members would not have provided their Private Information to Defendant.

126. Defendant recognized that Plaintiff's and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and the other Class Members.

127. Upon information and belief, Defendant violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class Members' Private Information.

128. Upon information and belief, Plaintiff and Class Members have been damaged by Defendants' conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

## THIRD CAUSE OF ACTION
## Unjust Enrichment
## (On Behalf of Plaintiff and the Nationwide Class)

129. Plaintiff incorporates by reference herein paragraphs 1 through 92 above.

130. Plaintiff and Class Members conferred a benefit on Defendant by providing their Private Information to Defendant and by paying for services that should have included cybersecurity protection to protect their Private Information, which they did not receive.

131. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including from payments made to it by Plaintiff and Class Members.

132. As such, a portion of the payments made by Plaintiff and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

133. Defendant has retained the benefits of its unlawful conduct, including the amounts of payment received from Plaintiff and Class Members that should have been used for adequate cybersecurity practices that it failed to provide.

134. Upon information and belief, Defendant knew that Plaintiff and Class Members conferred a benefit upon it, which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiff's and Class Members' Private Information and prevented the Data Breach.

135. If Plaintiff and Class Members had known that Defendant had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendant.

136. Due to Defendant's conduct alleged herein, it would be unjust and inequitable under the circumstances for Defendant to be permitted to retain the benefit of its wrongful conduct.

137. Upon information and belief, as a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information;

(iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

138. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

139. Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## **FOURTH CAUSE OF ACTION**
**Violation of Unfair/Deceptive Statute**
**(On Behalf of Plaintiff and the Nationwide Class)**

140. Plaintiff incorporates by reference herein paragraphs 1 through 92 above.

141. The Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101, *et*

*seq.* (“MCPA”), applies to Defendant because Defendant is headquartered in Maryland and does substantial business in Maryland.

142. Plaintiff and Class Members all constitute consumers under the MCPA.

143. The MCPA prohibits “any unfair, abusive, or deceptive trade practice[.]” Md. Code Ann., Com. Law § 13-303.

144. Defendant violated the MCPA by, inter alia:

a. failing to implement and maintain reasonable security and privacy measures to protect Plaintiff and Class Members’ Private Information, which was a direct and proximate cause of the Data Breach;

b. failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Class Members’ Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, et seq., which was a direct and proximate cause of the Data Breach;

d. omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff and Class Members’ Private Information; and;

e. omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and

privacy of Plaintiff's and Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, et seq.

145. Moreover, Defendant violated the MCPA by failing to comply with the Maryland Personal Information Protection Act., Md. Comm. Code §§ 14-3501, et seq. ("PIPA"). Specifically, Defendant violated PIPA by, inter alia:

a. failing to "protect personal information from unauthorized access, use, modification, or disclosure";

b. failing to "implement and maintain reasonable security procedures and practices that are appropriate to the nature of the personal information owned, maintained, or licensed"; and

c. failing to require its third-party service providers (if any) to "require by contract that the third party implement and maintain reasonable security procedures and practices."

146. Defendant's omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of their Private Information.

147. Defendant intended to mislead Plaintiff and Class Members and induce them to rely on its omissions.

148. Had Defendant disclosed to Plaintiff and Class Members (or their third-party agents) that its data systems were not secure—and thus vulnerable to attack—Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant accepted the Private Information that

Plaintiff and Class Members entrusted to it while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff and Class Members acted reasonably in relying on Defendant's omissions, the truth of which they could not have discovered through reasonable investigation.

149. Defendant acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiff and Class Members' rights.

150. As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiff and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Private Information.

151. Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law.

**PRAYER FOR RELIEF**

Plaintiff and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D. Awarding Plaintiff and the Class applicable compensatory, exemplary, punitive, and statutory damages, and restitution, as allowed by law and proved at trial;

E. Awarding attorneys' fees and costs, as allowed by law;

F. Awarding prejudgment and post-judgment interest, as provided by law;

G. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

H. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all claims so triable.

Date: September 16, 2026

Respectfully submitted,

*/s/ Leanna A. Loginov*
Leanna A. Loginov (MD Fed Bar No. 31890)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Avenue, Suite 705
Miami, FL 33132
T: (305) 479-2299
E: lloginov@shamisgentile.com

Terence R. Coates*
Jonathan T. Deters*
MARKOVITS, STOCK & DEMARCO, LLC
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
tcoates@msdlegal.com
jdeters@msdlegal.com

***Attorneys for Plaintiff and Proposed Class***

** Admission applications forthcoming*